## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## AT KANSAS CITY

| | |
|---|---|
| **BRIDGETTE GRAY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No.:** |
| v. ) | |
| ) | **REQUEST FOR JURY TRIAL** |
| **U.S. BANCORP d/b/a US BANK,** ) | |
| ) | |
| **Defendant.** ) | |

SERVE:   Manager in Charge of Office:
US Bank
12800 Foster Street
Overland Park, Kansas 66213

## **COMPLAINT**

COMES NOW, Plaintiff Bridgette Gray, by and through undersigned counsel, and for her claims against Defendant US Bank, states as follows:

1. Plaintiff is female and resident of the State of Kansas.

2. Defendant is a Delaware corporation with its principal place of business in Minnesota.

3. This case involves two torts:

    a. Discrimination in employment based on sex, in violation of Title VII of the Civil Rights Act; and

    b. Retaliation for opposing conduct prohibited by Title VII of the Civil Rights Act, in violation of the same.

4. Plaintiff worked for Defendant in Overland Park, Johnson County, Kansas.

5. Plaintiff was subjected to a hostile work environment created by one of Defendant's employees while at this location.

6. Plaintiff made a complaint to Defendant about these actions and participated in an investigation of these actions while at this location.

7. Defendant took adverse actions against Plaintiff, including withdrawing renewal of Plaintiff's contract at this location.

8. Defendant works in an industry affecting interstate commerce, in that Defendant operates banks throughout the United States and serves clients throughout the United States.

9. Defendant employed more than 15 employees in 2018 and 2019.

10. Defendant employed more than 500 employees in at least 20 calendar weeks 2018 and 2019.

11. Thus, Defendant is an "employer" within the meaning of the Civil Rights Act, pursuant to 42 U.S.C. § 2000e(a)-(b).

12. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because each of Plaintiff's claims arises under the laws of the United States, specifically Title VII of the Civil Rights Act.

## FACTS COMMON TO ALL COUNTS

13. Plaintiff was placed to work at Defendant's office by a staffing agency, Horizontal Integration, Inc. ("HII") on or about September 6, 2018.

14. Plaintiff received her paycheck from HII.

15. Plaintiff received all training for her assignments from employees of Defendant.

16. Plaintiff received each and every assignment at work from an employee of Defendant.

17. Plaintiff was directly supervised by employees of Defendant.

18. Plaintiff's attendance was tracked and monitored by both Defendant and HII.

19. Plaintiff's work performance was critiqued and corrected by employees of Defendant.

20. Defendant provided Plaintiff with all equipment needed to perform her job, including an office phone number and work email address: bridgette.gray@usbank.com.

21. Both Defendant and HII were responsible for implementing their own individual policies against sexual harassment and compliance with Title VII.

22. Thus, Defendant was Plaintiff's joint employer. *See Bristol v. Bd. of Cty. Comm'rs of Cty. of Clear Creek*, 312 F.3d 1213, 1218-19 (10th Cir. 2002).

23. Plaintiff worked for Defendant as a Business Technology Analyst.

24. Plaintiff's duties included various analytic studies and reports regarding technology and its performance in servicing clients of Defendant

25. Plaintiff's desk was near a supervisor for another team, Pablo Gonzalez, an employee of solely Defendant.

26. Gonzalez's supervisor was Craig Hamburg, also an employee solely of Defendant.

27. Hamburg's desk was next to both Plaintiff and Gonzalez.

28. Approximately one month after beginning her position with Defendant, Gonzalez began making crude sexually charged comments to Plaintiff.

29. These included asking Plaintiff what "type of guys" she was in to and generally inquiring about Plaintiff's love life.

30. Plaintiff attempted to steer these conversations away from any such topics, but Gonzalez persisted in steering conversations back to the inappropriate subject matter.

31. In one such conversation, Gonzalez—a Hispanic male—asked Plaintiff: "Are you thirsty for a Mexican?"

32. Plaintiff understood this to be an offer of sex.

33. Plaintiff did not engage with Gonzalez at any time.

34. Instead, Plaintiff did her best to brush off these comments and ignore them as best she could.

35. Plaintiff did not want to get labeled as a "troublemaker" and hoped she could handle the situation herself.

36. However, because Gonzalez was a supervisor, Plaintiff decided it was best to do so delicately and non-directly.

37. Plaintiff told Gonzalez that she was not interested in him or having discussions about her sex life at work.

38. Plaintiff suggested that the two keep things "strictly professional," particularly because Gonzalez was her boss.

39. Following Plaintiff's rejection, Gonzalez became even more emboldened and obsessed with winning Plaintiff's affections.

40. Gonzalez began texting Plaintiff lewd and sexual remarks.

41. These text sent in the first few months of Plaintiff's employment with Defendant included, but were not limited (all errors in original):

    a. "You better be careful or I'll use the back scratcher to spank you";

    b. "I need to bend you over the side of my bed";

    c. "I had some thoughts of what those lips could do";

    d. "I'm heading downstairs to chill in the brake room. You can walk me down and get felt up [emoji]";

    e. "Do you think I'm incapable of stuffing you";

    f. "So what's your favorite position";

    g. "What would you have done to me if I was with you last night";

    h. "Well, I would like to have you lying face up on the beg with your head hanging off the edge while I use your mouth"; and

    i. "Do you like anal".

42. Plaintiff did her best to ignore these texts or to respond by expressing her dislike for the messages.

43. These texts were sent both while Plaintiff was at work and after working hours.

44. Often Gonzalez would send these messages at regular intervals, *e.g.*, one every hour or thirty minutes, despite Plaintiff having not responded in any way to the previous message.

45. After several weeks of these types of messages, Plaintiff told Gonzalez directly that she did not like getting those messages and she did not want any coworkers to see those messages because Plaintiff believed she would get in trouble.

46. Plaintiff told Gonzalez that she was changing his name in her phone to "PG-13," and that anything he sent her should be "rated PG-13."

47. Despite these protests, Gonzalez did not stop sending explicit text messages to Plaintiff.

48. Gonzalez also began sending Plaintiff inappropriate instant messages using an instant messaging program utilized by Defendant's staff.

49. This was particularly frustrating as the instant messages were also used for work purposes, and thus Plaintiff could not simply ignore them as she could with text messages from Gonzalez.

50. Gonzalez also began touching Plaintiff at work.

51. As Plaintiff sat at her desk working, Gonzalez would approached her from behind and caress her shoulders to get Plaintiff's attention.

52. He would also grab at and play with Plaintiff's hair as he spoke to her.

53. Gonzalez would also hover around Plaintiff, often staring at her for long periods of time without saying anything to her.

54. On multiple occasions, Plaintiff told Gonzalez "Stop!" and "Get away from me!"

55. At times, Plaintiff became so frustrated she would nearly yell "stop" and "get away" to Gonzalez.

56. Several coworkers would look at the two in reaction to Plaintiff's loud complaints.

57. Hamburg was present for a number of such occurrences where Plaintiff yelled at Gonzalez to stop.

58. Despite seeing Plaintiff's aversion to this behavior, Hamburg did nothing to correct or prevent Gonzalez's inappropriate behavior towards Plaintiff.

59. From December 2018 to February 2019, Gonzalez was away from Defendant's Kansas office for personal and/or business reasons.

60. During this time period, Plaintiff's coworkers noticed that Plaintiff was happier and more relaxed, and made comments about the same.

61. Unfortunately, Gonzalez returned to the Kansas office at the end of February 2019.

62. Upon his return, Gonzalez immediately resumed his sexually-charged behavior towards Plaintiff.

63. On February 22, 2019, Plaintiff was working near Gonzalez.

64. Plaintiff had to reach across her desk to run a cord from behind the desk to her computer.

65. To accomplish this, Plaintiff bent over the top of the desk to reach down and grab the cord.

66. As a result, Plaintiff's buttocks were up in the air.

67. Gonzalez stared at Plaintiff's buttocks the entire time Plaintiff was performing this task.

68. Gonzalez's ogling was so noticeable several employees made comments and jokes to Gonzalez about it.

69. Plaintiff became extremely embarrassed by the occurrence and the comments everyone was making about her and Gonzalez.

70. Shortly after this, Gonzalez sent a text to Plaintiff stating: "So…I was looking at you bending over your desk".

71. Plaintiff angrily replied: "I think everyone is aware of that".

72. Plaintiff then texted to Gonzalez: "You just dont [sic] care at all".

73. Gonzalez replied: "Care about what?"

74. Plaintiff responded: "People see you messaging me or talking to me".

75. Gonzalez continued his lewd behavior towards Plaintiff.

76. A few days later, Plaintiff told Gonzalez she wanted him to stop all of his inappropriate behavior.

77. Plaintiff reiterated to Gonzalez that she was not interested in him or having discussions about her sex life with him—particularly not at work.

78. Plaintiff informed Gonzalez that she was in a relationship with someone.

79. Following Plaintiff's rejection, Gonzalez became angry.

80. Later that day, Plaintiff was walking in the stairwell by herself.

81. As she entered the stairwell, Gonzalez followed her.

82. Gonzalez pushed Plaintiff against a wall in the stairwell and tried to kiss her.

83. Plaintiff told Gonzalez to stop and pushed him away from her.

84. Plaintiff ran back to her desk.

85. A coworker noticed that Plaintiff was upset and went to ask Plaintiff what was wrong.

86. Plaintiff explained what had happened with Gonzalez.

87. Plaintiff told the coworker that Plaintiff hated working with Gonzalez because of his behavior.

88. The coworker explained that she had seen several female employees—particularly staffing agency workers—who were treated similarly by Gonzalez.

89. The coworker mentioned that Gonzalez would stare, leer, and hover around these female employees just like he did with Plaintiff.

90. The coworker told Plaintiff that Plaintiff is better off just ignoring it because Hamburg wouldn't do anything about it because he liked Gonzalez.

91. Shortly after this, Gonzalez sent an angry text to Plaintiff.

92. The text read: "I like you and WANTED to have fun with you…you don't want to have fun with me and that's fine".

93. The following day, Gonzalez approached Plaintiff and made fun at his attempted sexual assault of her.

94. Plaintiff ignored Gonzalez and attempted to focus on her work.

95. However, Gonzalez's behavior towards Plaintiff did not change at all, and he continued his sexual harassment of her.

96. Following the desk incident, Plaintiff's coworkers began discussing that Gonzalez was "obsessed" with Plaintiff.

97. These coworkers would ask Plaintiff why Gonzalez bothered her so frequently.

98. Plaintiff did her best to down play the impact the behavior was having on her, not wanting to become a focal point of her coworkers or office gossip.

99. Plaintiff found answering these questions and discussing Gonzalez's behavior extremely humiliating and embarrassing.

100. One coworker in particularly, James "Rob" Hayes, became very vocal about how he believed that Gonzalez was harassing Plaintiff.

101. Hayes, who worked remotely with Gonzalez's team, would comment on how often Gonzalez would be "butting in" on Plaintiff's calls with Hayes.

102. Hayes then began circulating memes to Gonzalez and the work group which drew attention to Gonzalez's behavior.

103. These included a meme reading "LEAVE Bridgette ALONE!"

104. Despite this new attention being drawn to Gonzalez's behavior, he did not stop.

105. Gonzalez continued to send inappropriate texts and instant messages to Plaintiff, including asking is Plaintiff was afraid he "was going to cop a feel" of her.

106. Plaintiff did her best to just ignore Gonzalez, but he only become more and more persistent.

107. Gonzalez would frequently send instate messages to Plaintiff while Plaintiff was trying to work, including when Plaintiff was on the phone with clients or coworkers.

108. These messages asked Plaintiff to "reward" Gonzalez and admitted that Gonzalez "just like[s] annoying" Plaintiff.

109. In late May 2019, Plaintiff's team was on a tight deadline for a project.

110. Gonzalez set about harassing Plaintiff, causing her difficulty in communicating with Hayes over the phone on several occasions.

111. Hayes became extremely frustrated at Gonzalez's impact on Plaintiff's ability to work, particularly in relation to this impending deadline.

112. Hayes made a complaint to Roberta Judson, the team leader for Plaintiff and Hayes, about Gonzalez's behavior.

113. Judson asked Plaintiff about the behavior, and Plaintiff disclosed everything that had happened.

114. Plaintiff also showed Judson some of the text messages Gonzalez had sent Plaintiff.

115. Shortly after this, Hamburg interviewed Plaintiff about Gonzalez's behavior.

116. This interview was extremely awkward for Plaintiff, as Hamburg had witnessed several of the events she described because his desk was very close to Plaintiff's desk.

117. Hamburg was visibly uncomfortable during the interview as well, particularly when Plaintiff would indicate that Hamburg himself had been a witness to a particular act by Gonzalez.

118. Plaintiff asked to be moved away from Gonzalez.

119. Hamburg concluded the interview and "investigation," but Plaintiff was not moved.

120. Eventually, Judson followed up with Plaintiff about the investigation.

121. Plaintiff explained that she had participated in an interview with Hamburg, but nothing else had happened.

122. Judson said she would ask Hamburg was he was planning on doing.

123. Around June 13, 2019, Plaintiff was told that she was being moved to another supervisor as part of a "reorganization."

124. However, it seemed that only Plaintiff was being moved.

125. Plaintiff began working under her new supervisor, Christi Estey, in late June.

126. Despite this move, Gonzalez would still frequently come by Plaintiff's new work space.

127. As he no longer worked near Plaintiff, there was no reason for Gonzalez to be around Plaintiff other than to sexually harass her.

128. Plaintiff brought up Gonzalez's continued behavior with a Human Resources representative.

129. Ultimately, Plaintiff was interviewed over the phone by Davina Johnson.

130. In that interview, Plaintiff again reported all the inappropriate behavior of Gonzalez that she had experienced and was continuing to experience.

11

131. At the end of the call, Johnson told Plaintiff that if Defendant learned that Plaintiff had discussed the investigation, Gonzalez's behavior, or the fact that Plaintiff made a complaint with anyone other than Johnson or Julie Meeks, another Human Resources Officer, Plaintiff would be immediately discharged.

132. Plaintiff said she understood, and the interview ended.

133. During August 2019, Plaintiff was assigned to a high profile, high profit job for Defendant.

134. The team assigned to that project had completed a detailed estimate of the budget, which included participation by three joint-employees such as Plaintiff.

135. That budget had been submitted and approved around August 13, 2019.

136. Plaintiff began working on that assignment in late August.

137. Plaintiff's current contract was set to expire on September 27, 2019.

138. Plaintiff anticipated that the contract would be renewed, as it had in the past, particularly because her position was factored in to the budget for this new project.

139. On August 28, 2019, Defendant discharged Gonzalez from employment.

140. That afternoon, Defendant called all workers in Plaintiff's area in to a meeting.

141. Plaintiff was the only employee not required to attend the meeting.

142. In fact, Plaintiff was told she could not attend the meeting.

143. After the meeting, Plaintiff's coworkers seemed to be avoiding Plaintiff and looking at Plaintiff with regret.

144. On August 29, 2019, Estey emailed Plaintiff.

145. In that email, Estey told Plaintiff: "I know how this looks, but we have decided not to extend your contract."

146. Plaintiff was shocked.

147. Plaintiff's contract was set to expire on September 27, 2019.

148. Plaintiff had been party to the negotiations for and approval of the budget for her new project.

149. Plaintiff knew that she was accounted for in that budget.

150. The following day, Plaintiff received an email from Ben Haymaker of HII.

151. Haymaker congratulated Plaintiff on Defendant extending Plaintiff's contract.

152. Confused, Plaintiff contacted Haymaker and relayed what Estey had told Plaintiff about her non-extension.

153. Haymaker replied that HII has "just received a very different message" and he was asking for clarification.

154. Having not heard anything, Plaintiff emailed Estey to make sure she had understood Defendant's intentions with Plaintiff's contract.

155. Estey replied: "Please refer to the email on Thursday, 29-Aug, at 9:41am CT that stated that we do not have the funds to continue your contract and they your last day is on 27-Sep."

156. Plaintiff replied that she was only checking because HII had gotten conflicting information.

157. Estey replied that she was sure Plaintiff was not getting her contract extended.

158. On September 5, Plaintiff reached out to Meeks again to discuss the non-renewal situation.

159. Meeks replied that Defendant would be conducting an investigation into the matter.

160. Meeks reminded Plaintiff of the warning about discussing the issue with anyone except Meeks or Johnson.

161. A meeting was set up for September 11, 2019 by Defendant, with representatives from HII and Scott Nelson, an assistant vice president of Defendant.

162. The day prior to that meeting, Meeks sent an email to Plaintiff notifying Plaintiff that an investigator may contact her, but "[i]t is voluntary to assist us in this review."

163. At the meeting, Nelson told Plaintiff and the others that the purpose of the meeting was to discuss comments Plaintiff had made to Meeks about the end of Plaintiff's assignment.

164. Nelson did not elaborate further on what "comments" he was referring to or wanted to discuss.

165. Nelson asked Plaintiff to described how she learned her assignment was ending.

166. Plaintiff described the series of conflicting communications.

167. Nelson asked Plaintiff if she had any "other concerns."

168. Remembering Meeks' warning, Plaintiff stated that she did not.

169. Nelson seemed pleased with this response, and asked Plaintiff to state again there was nothing about the ending of her contract that she wanted to discuss with the group.

170. Remembering Meeks' warning, Plaintiff stated there was not.

171. Nelson than stated that Plaintiff's contract was not renewed because of budget concerns.

172. Plaintiff asked if other staffing agency workers were also having their contract renewals withdrawn.

173. Nelson stated that three workers—including Plaintiff—were on the project Plaintiff had been assigned to, and only Plaintiff's contract was not being renewed.

174. Neither of the other two workers had made complaints about sexual harassment.

175. HII told Plaintiff that they were looking for a new assignment for Plaintiff and would update Plaintiff about that.

176. The meeting was then ended.

177. Plaintiff's employment with Defendant ended on September 27, 2019.

178. On or about September 4, 2019, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant had engaged in the discriminatory actions being alleged in this lawsuit, or alternatively, all conduct alleged herein would have arisen from the investigation of such Charge of Discrimination.

179. A Notice of Right-to-Sue letter dated January 13, 2021 has been issued by the EEOC and this action is being brought within ninety (90) days of the issuance of such Right-to-Sue letter.

180. Plaintiff has fulfilled all conditions precedent to the bringing of these claims and has duly exhausted all administrative procedures prior to instituting this lawsuit in accordance with the law.

181. All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees, acting within the course and scope of their employment, as set forth herein.

## COUNT I – SEX DISCRIMINATION (HOSTILE WORK ENVIRONMENT) IN VIOLATION OF THE CIVIL RIGHTS ACT

182. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 181 of her Complaint, as though fully stated herein.

183. Plaintiff is a female.

184. During her employment with Defendant, Plaintiff was subjected to adverse treatment of a continuing nature, including but not limited to:

   a. Crude sexual comments;

   b. Unwelcomed touching;

   c. Offers of sex;

   d. Inappropriate comments about Plaintiff's body;

   e. Inappropriate questions about Plaintiff's personal life;

   f. Staring and leering; and

   g. Pressing Plaintiff against a wall while attempting to kiss Plaintiff.

185. This conduct, by and through a supervisory employee of Defendant, created an intimidating, hostile, and/or offensive work environment.

186. This conduct was part of a larger pattern and practice of sexual harassment by this employee of Defendant.

187. Despite being aware of this pattern and practice of sexual harassment by this supervisory employee, Defendant failed to take appropriate prompt remedial actions.

188. Defendant further failed to take appropriate prompt remedial actions upon learning of the harassment experienced by Plaintiff.

189. Plaintiff's sex was the motivating factor in this conduct.

190. This harassment was not an isolated incident, but a severe and pervasive pattern of hostility that impacted terms, conditions, and privileges of Plaintiff's employment, including but not limited to:

   a. Interfering with Plaintiff's ability to concentrate during her assigned work;

      b. Interfering with Plaintiff performing her assignments;

      c. Interfering with Plaintiff's ability to communicate effectively with her team members;

      d. Depriving Plaintiff of a resource for training and assistance for fearing of unwanted sexual harassment; and

      e. Depriving Plaintiff of a workplace free from sexual harassment and discrimination.

191. This discrimination was so severe that it rendered Plaintiff's working conditions objectively intolerable.

192. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary issues, loss of employment opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

193. The conduct of Defendant was outrageous and evidenced an evil motive or reckless indifference for the rights of Plaintiff, entitling Plaintiff to an award of punitive damages.

194. Plaintiff is also entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $75,000.00; for punitive damages; for Plaintiff's costs and expenses incurred herein; attorneys' fees; and for all other relief deemed just and proper by this Court.

## COUNT II - RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT

195. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 194 of her Complaint, as though fully stated herein.

196. Plaintiff made internal complaints of actions prohibited by the Civil Rights Act; namely, sexual harassment and failure to take prompt remedial action to correct such harassment.

197. Defendant took adverse actions against Plaintiff.

198. These adverse actions included, but are not limited to:

   a. Threatening Plaintiff's job if she discussed what she reported;

   b. Failing to take actions to protect Plaintiff from her harasser;

   c. Moving Plaintiff to a position which continued to expose her to her harasser;

   d. Refusing to renew Plaintiff's contract;

   e. Ostracizing Plaintiff;

   f. Claiming a false reason for discharging Plaintiff; and

   g. Discharging Plaintiff from employment.

199. The motivating factor in these adverse actions taken by Defendant with respect to Plaintiff's employment was Plaintiff's complaints about activity prohibited by the Civil Rights Act.

200. Thus, these were acts of retaliation.

201. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary issues, loss of employment opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

202. The conduct of Defendant was outrageous and evidenced an evil motive or reckless indifference for the rights of Plaintiff, entitling Plaintiff to an award of punitive damages.

203. Plaintiff is also entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $75,000.00; for punitive damages; for Plaintiff's costs and expenses occurred herein; attorneys' fees; and for all other relief deemed just and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury in the United States District Court for the District of Kansas, to be held at the Robert J. Dole Federal Courthouse in Kansas City, Kansas, on all accounts and allegations of wrongful conduct alleged in this Complaint.

Respectfully submitted,

 /s/ Daniel L. Doyle
Daniel L. Doyle, KS Bar No. 11260
Robert A. Bruce, KS Bar No. 28332
DOYLE & ASSOCIATES LLC
748 Ann Avenue
Kansas City, Kansas  66101
Telephone:  (913) 371-1930
Facsimile:  (913) 371-0147
d.doyle@ddoylelaw.com
r.bruce@ddoylelaw.com
ATTORNEYS FOR PLAINTIFF